# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL NO. |
| v. | : | 15-CR-25 (JCH) |
| | : | |
| BRETT LILLEMOE AND | : | |
| PABLO CALDERON, | : | |
| Defendants. | : | MARCH 16, 2017 |
| | : | |

## RULING RE: LILLEMOE'S MOTION FOR A JUDGMENT OF ACQUITTAL, OR IN THE ALTERNATIVE, A NEW TRIAL (DOC. NO. 336) AND CALDERON'S MOTION FOR A JUDGMENT OF ACQUITTAL OR FOR A NEW TRIAL (DOC. NO. 337)

## I.    INTRODUCTION

On November 9, 2016, defendant Brett Lillemoe was convicted of one count of conspiracy and five counts of wire fraud, and defendant Pablo Calderon was convicted of one count of conspiracy and one count of wire fraud.[1]  Lillemoe and Calderon each timely filed a Motion for a Judgment of Acquittal, pursuant to Rule 29 of the Federal Rules of Criminal Procedure.  In the alternative, Lillemoe and Calderon move for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure.  (Doc. Nos. 336, 337).

For the reasons set forth below, both Motions are denied.

## II.    BACKGROUND

On February 20, 2015, the grand jury returned a twenty-three count Indictment against Brett Lillemoe, Pablo Calderon, and Sarah Zirbes.  Indictment (Doc. No. 1).  The Indictment charged Lillemoe with one count of conspiracy to commit wire fraud and

---

[1] A third defendant, Sarah Zirbes, was acquitted on all counts against her.  Jury Verdict (Doc. No. 324).

bank fraud, nineteen counts of wire fraud, one count of bank fraud, and one count of money laundering.  Id. at ¶¶ 1-56.  The Indictment charged Calderon with one count of conspiracy to commit wire fraud and bank fraud, nineteen counts of wire fraud, one count of bank fraud, one count of money laundering, and one count of false statement. Id. at ¶¶ 1-56.  Almost all of the counts in the Indictment revolved around the defendants' involvement with the Export Credit Guarantee program ("GSM-102"), a program run by the United States Department of Agriculture ("USDA").  The only exception was Count Twenty-Three, which alleged that Calderon made a false statement in connection with the Federal Bureau of Investigation's investigation into the defendants' scheme.  Id. at ¶¶ 55-56.

In order to accurately describe the scheme at issue in the trial, it is first necessary to describe a typical GSM-102 transaction.  The GSM-102 program is a federal program designed to encourage agricultural exports to developing countries. See 7 C.F.R. § 1493.10(a) (2014) (describing the program's purpose "to expand U.S. agricultural exports by making available export credit guarantees to encourage U.S. private sector financing of foreign purchases of U.S. agricultural commodities on credit terms.").[2]  In a standard GSM-102 transaction, a U.S. exporter would enter into an agreement with a foreign importer of U.S. agricultural goods to import goods to an approved developing nation.  7 C.F.R. § 1493.10(d).   The foreign importer would then approach an approved foreign bank for a letter of credit naming the U.S. exporter as the beneficiary.  See 7 C.F.R. § 1493.20(k) (noting that the letter of credit must be issued by

---

[2] Although the GSM-102 regulations were revised on December 18, 2014, all of the charged conduct occurred between 2007 and 2012.  Therefore the relevant regulations are those regulations that were in effect before the 2014 version.  See Indictment at ¶ 50.

a "CCC-approved foreign banking institution").  The letter of credit would be payable on presentation of certain shipping documents named in the letter of credit, such as a bill of lading, to the bank.  See UCP 600, Ex. 2603, Art. 15.[3]  The foreign bank would then approach a U.S. bank, asking the U.S. bank to "confirm" the letter of credit, whereby the U.S. bank would commit to pay the beneficiary on behalf of the foreign bank that issued the letter of credit in exchange for a promise by the foreign bank to pay back the U.S. bank with interest.  See id. at Art. 8.  If the U.S. bank confirms the letter of credit, the U.S. bank must pay the beneficiary of the letter of credit when the conditions of payment, as set out in the letter of credit, are satisfied.  Id.  The GSM-102 program facilitates these transactions by guaranteeing a portion, most commonly 98%, of the money promised in the letter of credit in the event that a foreign bank defaults on its obligation to repay the debt.  See Trial Tr. at 788:9-15.

The program is administered by the Commodity Credit Corporation ("CCC"), an agency within the USDA.  7 C.F.R. § 1493.10 (a) (2014).  An exporter who wishes to take advantage of the GSM-102 program must first have a firm export sale in place, and then may submit an application to the CCC for a guarantee on the transaction.  7 C.F.R. § 1493.40 (2014).  The guarantee will cover the exporter or their assignee in the event that the foreign importer or foreign bank defaults on its obligation under the letter of credit.  7 C.F.R. § 1493.10(a) (2014).  That way, if the foreign bank refuses to pay or defaults on the letter of credit, the U.S. exporter will be left with only a small fraction of a

---

[3] The UCP 600 is the product of the International Chamber of Commerce's Commission on Banking Technique and Practice, and is often incorporated by reference into letters of credit.  See UCP 600 at Forward.  It is the governing set of rules for almost all commercial letter of credit in the world.  Trial Tr. at 2773:24-2774:10.

loss, thereby encouraging foreign exports to developing nations by reducing the risk of nonpayment.

The GSM-102 program has also been utilized to finance a different type of transaction, which was referred to during trial as a third party GSM-102 transaction.  In a third party transaction, a non-exporting third party will buy the rights to a bill of lading for a GSM-102 eligible shipment, so long as the actual exporter did not apply for a GSM-102 guarantee on the same shipment.  The third party will then use the shipping information provided by the physical exporter to apply for a GSM-102 guarantee.  Next, the third party will execute a transaction with a foreign entity based in the country that the commodity was actually shipped to, essentially mirroring the sale of the physical goods.  This foreign entity is often a subsidiary or a related entity to the third party's domestic entity.  The foreign buyer then applies for an irrevocable letter of credit from a foreign bank naming the domestic entity as the beneficiary to finance the sale.  Finally, the foreign entity sells the rights to the goods back to the original, actual exporter for an amount less than they were bought for.  Through this sale, the third party effectively pays a fee for "renting" the trade flow from the actual exporter.

Meanwhile, the letter of credit is then forwarded to a U.S. bank, which will confirm the letter of credit, and pay the third party on presentation of the various documents named in the letter of credit.  The third party will then forward those funds to the foreign bank who originally issued the letter of credit.  The effect of this convoluted transaction is to create a loan from the U.S. bank to the foreign bank that is guaranteed by the CCC through the GSM-102 program.  The legality of the third party transaction was not at

issue during the trial.  See Jury Charge (Doc. No. 323) at 47 ("Participating in the GSM-102 Program as a financial intermediary is not, in itself, illegal.").

Instead, the Indictment alleged that Lillemoe and Calderon, who positioned themselves as third parties in GSM-102 transactions, conspired to commit bank fraud and wire fraud by materially altering shipping documents.  Indictment at ¶¶ 27-28. Specifically, the Indictment alleged that Lillemoe and Calderon created multiple entities to maximize their share of the limited numbers of GSM-102 guarantees, which were split pro rata among applicants, id. at ¶ 29-33; Trial Tr. at 799:17-800:21, and altered bills of lading marked "copy non negotiable" by whiting out that marking and stamping the word "original" in its place, id. at ¶ 40.  The Indictment also alleges that Lillemoe and Calderon altered documents by adding shading to portions of documents to make the alterations less apparent.  Id. at ¶ 41.

The scheme that the government described at trial involved the defendants using altered bills of lading to secure loans from U.S. banks to foreign banks, and charging the foreign banks a fee for the service.  Specifically, the government offered evidence that the defendants had purchased the rights to copies of bills of lading marked "Copy – Non-Negotiable," whited-out those markings, and then applied their own stamp to mark the bills of lading "Original."  They then presented these altered documents to two U.S. banks, Deutsche Bank and CoBank, causing the banks to disburse funds according to the terms of the letters of credit.  The government also put forth evidence that the defendants changed dates of bills of lading in order to ensure that they could utilize as much of the GSM-102 guarantees as possible.

The evidence presented by the government at trial consisted, <u>inter alia</u>, of (1) the GSM-102 program files that contained the documents that were submitted to the U.S. banks; (2) the unaltered bills of lading that were provided to Lillemoe and Calderon; (3) testimony from a CoBank employee, Holly Womack ("Womack"); (4) testimony from a Deutsche Bank employee, Rudy Effing ("Effing"); (5) testimony from a USDA employee, Jon Doster ("Doster"); (6) testimony from FBI Special Agent Steven West; and, on rebuttal, (7) testimony of an expert on letters of credit, James Byrne ("Byrne").  The defense case consisted of, <u>inter alia</u>, three experts: (1) testimony of an expert on bills of lading, Professor Michael Sturley; (2) testimony of an expert on letters of credit, Vincent O'Brien ("O'Brien"); and, (3) testimony of an expert on the GSM-102 program, Professor Steven Lindo ("Lindo").  The defendants also introduced various character witnesses, and defendant Brett Lillemoe testified in his own defense.

On November 3, 2016, the case was submitted to the jury.  On November 9, 2016, the jury returned a verdict of guilty for Lillemoe on Counts One of conspiracy and Counts Two through Six of wire fraud and returned a verdict of guilty for Calderon on Count One of conspiracy and Count Six of wire fraud.  <u>See</u> Verdict (Doc. No. 324).[4]  A co-defendant, Sarah Zirbes ("Zirbes"), who had been charged with them in Counts One and Seven through Twenty Two, was acquitted of all charges.  <u>Id.</u>

All of the counts of wire fraud for which the defendants were convicted involved a transaction with CoBank.  Indictment at 23.  The letter of credit in the transaction was issued by a bank in Russia, IIB, and the goods were shipped on a vessel called Cool

---

[4] They were both acquitted of all other counts.  <u>See</u> Verdict.

Express.  See Ex. 250 (GSM-102 file for the transaction).  Thus, at trial, the transaction was referred to as the "Cool Express transaction."

## III.   LEGAL STANDARD

Rule 29 of the Federal Rules of Criminal Procedure requires the court, on motion by a defendant, to "enter a judgment of acquittal for any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a).  The defendant who challenges the sufficiency of his conviction "faces an uphill battle, and bears a very heavy burden."  United States v. Mi Sun Cho, 713 F.3d 716, 720 (2d Cir. 2013) (citation and internal quotation marks omitted).  This is because the court in deciding a motion for a judgment of acquittal must view the evidence in the light most favorable to the government, draw all inferences in favor of the government, and must defer to the jury's assessment of witness credibility.  United States v. Hawkins, 547 F.3d 66, 70 (2d Cir. 2008).  The question for the court is whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Mi Sun Cho, 713 F.3d at 720 (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979).  The court must view the evidence in its totality.  United States v. Cassese, 428 F.3d 92, 98-99 (2d Cir. 2005).  Additionally, the court must be careful not to substitute its determination of the weight of the evidence, or the inferences to be drawn, or the credibility of the witnesses, for that of the jury.  Id.

Rule 33 of the Federal Rules of Criminal Procedure allows the court, on motion of the defendant, to vacate any judgment and grant a new trial if it is in the interest of justice.  Granting a motion for a new trial should be done sparingly, and only if "the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice."  United States v. Triumph Capital Grp., Inc., 544 F.3d

149, 159 (2d Cir. 2008) (citation omitted).  In resolving a motion for a new trial under Rule 33, the court is permitted to reevaluate the evidence, but "generally must defer to the jury's resolution of conflicting evidence."  United States v. Ferguson, 246 F.3d 129, 133-34 (2d Cir. 2001).

## IV.   DISCUSSION

The moving defendants advance five separate arguments in their briefs.  See Mem. of Law in Supp. of Def. Brett Lillemoe's Mot. for J. of Acquittal, or in the Alternative, a New Trial (Doc. No. 336-1) ("Lillemoe Mem."); Memo. of Law in Supp. of Def. Pablo Calderon's Mot. for J. of Acquittal or for a New Trial (Doc. No. 338) ("Calderon Mem.")  These defendants make three separate arguments that the evidence was insufficient to support the convictions of wire fraud.  See Lillemoe Mem. at 3-4; Calderon Mem. at 1.  These defendants also argue that the evidence was insufficient to convict the defendants of conspiracy.  Id.  They ask the court to enter a judgment of acquittal or, in the alternative, a new trial.  Id.  Lillemoe also requests that the court grant a new trial because the court did not admit into evidence the GSM-102 regulations that went into effect in December 2014, more than 2 years after the time period alleged in the Indictment.  See Indictment at 6 (alleging that the timeframe of the conspiracy was from about September 2007 to about January 2012).

For the reasons that follow, the court is unpersuaded by the moving defendant's arguments.  Indeed, the evidence was more than sufficient to permit a rational trier of fact to determine that the moving defendants committed wire fraud and conspiracy, and the court properly exercised its discretion under Rule 403 of the Federal Rules of Evidence to exclude the evidence of subsequent revisions to the governing regulations.

A.    The Sufficiency of the Evidence that the Defendants Committed Wire
      Fraud

To convict Lillemoe and Calderon of the crime of wire fraud, as charged in

Counts Two through Six, the jury had to find that the government had proven the

following elements beyond a reasonable doubt:

> 1.  That there was a scheme or artifice to defraud Deutsche Bank or CoBank,
>     or to try to obtain money or property from Deutsche Bank or CoBank, by
>     materially false or fraudulent pretenses, representations, or promises;
>
> 2.  That each defendant knowingly and willfully participated in that scheme or
>     artifice to defraud with knowledge of its fraudulent nature and with specific
>     intent to defraud; and
>
> 3.  In execution of that scheme, each defendant used or caused the use of
>     the interstate wires as specified in that particular Count.

Jury Charge at 56; see 18 U.S.C. §1343; 2 Leonard B. Sand et al., Modern Federal Jury

Instructions: Criminal, Instruction 44-3.  In the Jury Charge, the court clarified that a

scheme to defraud "is a plan to deprive another of money or property by trick, deceit,

deception, or swindle."  Jury Charge at 58.  It charged that the government had to prove

that the defendants contemplated depriving Deutsche Bank or CoBank of money or

property, including by "depriving Deutsche Bank or CoBank of information necessary to

make discretionary economic decisions," so long as that information was material.  Id. at

61.  The Jury Charge also instructed that a material misrepresentation is one that "a

reasonable person might have considered important in making the decision to which it is

addressed.  To be material, the information withheld either must be of some

independent value or must bear on the ultimate value of the transaction."  Id. at 59.

9

Both defendants contest the sufficiency of the evidence of the first element,
offering three arguments in support of their position.  First, Lillemoe argues that there
was insufficient evidence that the banks were deprived of information necessary to
make a "discretionary economic decision" by the alterations made by defendants.
Lillemoe Mem. at 6-11.  Lillemoe and Calderon both dispute that the evidence could
prove beyond a reasonable doubt that the misrepresentations prevented the banks from
getting the benefit of the bargain, and as such could not constitute a "scheme to
defraud," as required by the first element.  Id. at 11-14; Calderon Mem. at 11-18.
Finally, the defendants both argue that the misrepresentations were not material to the
banks.  Lillemoe Mem. at 14-17; Calderon Mem. at 18-30.

> 1. There was Sufficient Evidence to show that the Banks were
>    Deprived of Information Necessary to Make an Economic Decision

Lillemoe argues that there was insufficient evidence that the misrepresentations
made by Calderon and him deprived CoBank of information necessary for the bank to
make a discretionary economic decision in the Cool Express transaction.  Lillemoe
Mem. at 7.  He argues that CoBank only had discretion at the stage of the transaction
where it was deciding to confirm the letter of credit from the foreign bank, in this case
IIB in Russia.  Id. at 8.  According to Lillemoe, at the time that Lillemoe presented the
altered documents to the bank, the bank had no discretion at all to reject the documents
as fraudulent, so long as they facially complied with the requirements set forth in the
letter of credit.  Id. at 9.  This theory was rejected by the jury, and the court sees no
reason to disturb their judgment.

Lillemoe is correct that CoBank had the discretion to confirm or reject the letter of
credit when it was sent from IIB.  See Trial Tr. at 2792:7-13 (O'Brien, the defendants'

expert on letters of credit, testifying that the banks would look at the terms and conditions of the letter of credit before deciding whether or not to confirm the letter of credit).  At that point, the bank decided whether or not it was willing to accept the risk of the foreign bank defaulting.  Id. at 2794:22-2795:16.  Lillemoe is also correct that the bank made this determination before any of the altered documents were presented to the bank, and therefore the alterations could not have affected the bank's decision to confirm or not confirm the letter of credit.  Id.  Further, under the UCP 600, a bank that has confirmed a letter of credit must honour—pay the funds as described in the letter of credit—upon presentation of complying documents.  See UCP 600, Art. 15b ("When a confirming bank determines that a presentation is complying, it must honour[.]").  The determination of whether or not a presentation is complying is to be made "on the basis of the documents alone."  Id. at Art. 14.  Lillemoe argues from this that the bank had no discretion to reject his facially complying presentation, and so the alterations he made could not have withheld information necessary for the bank to make a discretionary economic decision.  Lillemoe Mem. at 10.

Lillemoe's argument hinges on various decisions which reiterate that, in a wire fraud case, the information withheld or reported inaccurately must be "economically material."  See id. (citing United States v. Viloski, 557 Fed. App'x 28, 34 (2d Cir. 2014) cert. denied, 135 S. Ct. 1698 (2015)).  The information at the heart of the fraud claim must be the type of information that could influence the victim's choice of how to spend and invest his or her assets.  United States v. Rossomando, 144 F.3d 197, 201 n.5 (2d Cir. 1998).  Indeed, he is correct that the information must be salient to the victim's discretionary economic decision or "bear on the ultimate value of the transaction."  Id.

However, Lillemoe's conclusion that the information withheld in this case was not relevant to a discretionary economic decision is wrong for two reasons. First, although the alterations could not have affected the bank's decision to confirm the letter of credit, they could have affected the bank's determination of whether or not the presentation was complying. For example, the letter of credit in the Cool Express transaction at issue in Counts Two through Six required the beneficiary to present a copy of the original on board ocean bill of lading. Ex. 250 at ¶ 46A. If Lillemoe had presented CoBank with a document that stated affirmatively that it was not a copy of an original, the bank clearly would have been within its rights to reject the presentation as non-complying. See Trial Tr. at 2857:16-2859:3 (explaining that, if a bill of lading is presented on note paper and written in crayon, the bank would reject it). It follows logically that, if the bank had determined that the document it is presented with is a fraudulent bill of lading, it could reject that presentation as not complying. See Trial Tr. at 2965:18-2966:23 (O'Brien testifying that a bank that was aware that a document presentation contained fraud could choose not to release the funds). Lillemoe's argument is that, if the bank is presented with a document altered carefully enough that the bank cannot or does not detect the alteration, it has no discretion in that transaction under the UCP. He reasons that a person who doctors documents and presents them to a bank has committed no fraud if the bank has a contractual obligation to accept documents that appear to be genuine. This argument would apply equally to any fraudulent alteration of a document, from the date of shipment to the name of the beneficiary, because regardless of the information misrepresented, the bank would have to accept the document. Were the court to accept this argument, it would, in

effect, be condoning the unauthorized alteration of international trade documents, so long as the alterations were made with sufficient care that they were not immediately detectable.  The court rejects this result.

Even were the court persuaded that Lillemoe's theory was correct, it would not be the court's place to reject the determination by the jury, after being properly charged,[5] that the representations were material to the transaction, specifically the release of funds by the U.S. bank to the beneficiary.  See Jury Charge at 60 ("Here, the alleged scheme is to defraud Deutsche Bank or CoBank, and thus the relevant "decision" is Deutsche Bank's or CoBank's decision to release funds."). There was sufficient evidence before the jury for it to reject the defendants' theory that the banks had no discretion at the time of presentation.  For example, the jury heard from Womack that, if CoBank had not been presented with a copy of an original on board bill of lading, it would not have released the funds.  Trial Tr. at 500:20-501:8.  She further testified that CoBank was concerned with the bills of lading specifically because they were necessary to get repaid by the foreign bank or, if the foreign bank failed to pay, under the GSM-120 program.  Trial Tr. at 504:20-505:5.  Womack also testified that, if CoBank had learned that the documents with which it was being presented were fraudulent, it would have declined to release the funds.  See, e.g., Trial Tr. at 500:25-501:8, 504:13-505:5, 509:3-15, 530:5-25, 542:4-543:2.  The representative of Deutsche Bank, Rudy Effing, corroborated that Deutsche Bank too would have declined to release the funds if it had received documents that were not complying or were altered.  See, e.g., Trial Tr.

---

[5] Lillemoe requested this jury instruction. Proposed Jury Instruction (Doc. No. 273); see, also, Trial Tr. 3491:24-3492:12.

at 182:22-183:24, 215:20-216:10.  Finally, as noted above, O'Brien also testified that a

bank would be free to reject a presentation made with clearly fraudulent documents.

Trial Tr. at 2857:16-2859:3, 2965:18-2966:23.  The testimony of the banks' employees,

as well as the defendants' own expert, was sufficient evidence for the jury to find

beyond a reasonable doubt that there was an economic decision to be made at the time

the defendants presented the banks with the altered documents, namely whether or not

the documents with which they were presented were complying and to therefore release

the funds.

> 2.    There was Sufficient Evidence to show that the Banks were
>        Harmed by the Defendants' Deception

Second, both Lillemoe and Calderon argue that there was not sufficient evidence

to show that the banks had been exposed to loss, and therefore there was no scheme

to defraud.  See Jury Charge at 61 ("[T]he government must prove beyond a reasonable

doubt, that by executing or attempting to execute the scheme alleged in the Indictment,

Mr. Lillemoe [or] Mr. Calderon . . . placed Deutsche Bank or CoBank at a risk of

loss . . . .").  Both defendants contend that CoBank received the exact benefit of its

bargain in the Cool Express transaction, and therefore the scheme did not place

CoBank at a risk of loss.  See Lillemoe Mem. at 11-12; Calderon Mem. at 13.  The

thrust of their argument is that CoBank, as the financier of a third party GSM-102

transaction, intended to provide a loan to IIB that was guaranteed under the GSM-102

program.  Lillemoe Mem. at 12; Calderon Mem. at 13.  CoBank did enter into that loan,

and therefore, the defendants argue, CoBank got the benefit it bargained for.  The

government responds that the defendants did not give the bank the benefit of its

bargain, but rather withheld information essential to the transaction.  Gov.'s Opp. To Defs.' Mots. For J. of Acquittal, or for a New Trial (Doc. No. 351) at 29 ("Gov.'s Opp.").

Lillemoe argues that CoBank bargained for the benefit of a loan that was 98% guaranteed by the USDA in the event of default.  Lillemoe Mem. at 12.  He argues that the 2% risk that they assumed with regard to this transaction was the same as the 2% they risked in every GSM-102 transaction, and so the misrepresentation did not affect the underlying value of the transaction.  Id.  Lillemoe states that CoBank was not even exposed to that 2% risk in the Cool Express transaction, because he had paid CoBank a 3% fee, thus covering all of CoBank's risk.  Id. at 13.  He also argues that the GSM-102 regulations contain an indemnity clause, which states that the "CCC will not hold the assignee responsible or take any action or raise any defense against the assignee for any action, omission, or statement by the exporter of which the assignee has no knowledge," and therefore the bank, as Lillemoe's assignee, could not be held liable for Lillemoe's omission.  Id. at 13; 7 C.F.R. § 1493.120(e) (2014).  This argument bears many similarities to Lillemoe's first argument: again, he is arguing that, because his fraud was undetectable at first glance, it is not fraud.  It also fundamentally misstates the risk he defrauded the banks into accepting.

First, Lillemoe's payment of a 3% fee to the banks did not remove risk from the underlying transaction, but instead was part of CoBank's bargain.  The benefit of the bargain that CoBank anticipated was a return of 103%—being entirely repaid plus Lillemoe's fees—and not 101%—98% of the original guarantee plus Lillemoe's fees.  See Trial Tr. at 671:5-72:8.  Lillemoe's fees did not remove any risk that was inherent in the GSM-102 program.  Instead, they reflected that Lillemoe was paying CoBank for the

right to use some of CoBank assets.  Thus, CoBank was still exposed to a risk that it would not get the full benefit of its bargain, a 103% return on its loan.  However, even greater than the 2% risk of default was the risk that the CCC would not pay the guarantee if they discovered the doctored documents, or at the very least that they would litigate the issue.

It may be true that the GSM-102 regulations provide that an assignee cannot be held liable for misrepresentations made by exporters of which they have no knowledge.  See 7 C.F.R. § 1493.120(e).  A necessary predicate in the indemnity clause is that the assignee, in this case CoBank, has no knowledge.  The question of whether or not an individual or entity has "knowledge" of a misrepresentation is, of course, an issue over which many controversies are brought before courts.  Indeed knowledge and intent were central to this matter.  See, e.g., Jury Charge at 63 (discussing the need for the jury to find that a defendant had knowledge of the fraud and intent to defraud in order to be guilty of wire fraud).  Thus, even if the ultimate truth was that CoBank, as the assignee, had no knowledge that Lillemoe and Calderon had altered documents, the doctoring of the underlying documents increased the risk that the CCC would deny guarantee payments based on CCC's view that CoBank was aware of the alterations.  This dispute could potentially lead to protracted and costly litigation over the issue of whether CoBank had knowledge of the nature of the documents it had accepted.  A GSM-102 guarantee based on fraudulent documents is economically different than a GSM-102 guarantee based on documents which have not been altered.  The difference in risk is one for which CoBank did not bargain.  See United States v. Binday, 804 F.3d 558, 570 (2d Cir. 2015) (holding that misrepresentations go to an "essential element of

16

the agreement" when the agreement they expect to get has different risks than the agreement they enter into due to fraud).

Calderon argues that CoBank received the benefit of its bargain because the altered documents could not have affected certain components of the overall transaction: the specific terms of the loan from CoBank to IIB, the guarantee issued by the CCC to cover 98% of the loan, or the obligation of the foreign bank to repay the loan with interest. Calderon Mem. at 14-18. Calderon is correct that the altered documents could not affect the terms of the loan, but that is beside the point. Much as Lillemoe argues that the relevant decision point was the moment CoBank entered into an agreement with IIB to confirm the letter of credit, this argument completely ignores the other decision, the decision to release the funds upon presentation of the documents. See Lillemoe Mem. at 10; see also supra section IV.A.1. It is irrelevant that the altered documents could not have changed the terms of the loan.

Calderon argues that the guarantee's validity was not undermined by the misrepresentations because the GSM-102 program regulations provide that an assignee cannot be held responsible for omissions made by an exporter of which it was unaware. 7 C.F.R. § 1493.120(a) (2014). This argument repeats a claim made by Lillemoe that the indemnity clause protects the defendants from a charge of fraud. See Lillemoe Mem. at 13. It is similarly dispensed with. Although it may be true that CoBank would not have ultimately been held liable for the misrepresentations if the USDA determined that CoBank was unaware of the misrepresentation, the question of whether the bank was aware of the omission could have been disputed, exposing CoBank to the risk of additional litigation, and possible loss.

Additionally, Calderon's argument that the altered documents did not change the obligation of IIB to repay the loan is beside the point of whether or not Lillemoe and Calderon committed wire fraud. Wire fraud need not necessarily cause its victim a loss: it is sufficient if the victim is deprived of its right to use its property based on non-fraudulent information. Shaw v. United States, 137 S. Ct. 462, 467 (2016). A criminal defendant commits wire fraud when he or she "den[ies] the victim the right to control its assets by depriving it of information necessary to make discretionary decisions." Rossomando, 144 F.3d at 201 n.5. "This right to control theory is predicated on a showing that some person or entity has been deprived of potentially valuable economic information." United States v. DiNome, 86 F.3d 277, 283 (2d Cir. 1996). Thus the essential question is whether the information altered was potentially valuable economic information.

During trial, the government put forward sufficient evidence that the withheld information was essential for CoBank to control the disposition of its assets, because the letter of credit made the presentation of those documents an essential element of the disposition of CoBank's assets. See Ex. 250 at ¶46A (listing a copy of an original bill of lading as a required document). CoBank put its money into the transaction believing that the documents with which it had been presented were complying, and the defendants' misrepresentations deprived CoBank of the information necessary to reject the documents as non-complying. See Trial Tr. at 508:17-509:15, 515:2-11. Additionally, there was evidence that the defendants were aware of this risk. See, e.g., Ex. 1327 (email from Lillemoe to a physical exporter wherein Lillemoe tells the exporter that the bank financing the deal "need[s] the copy of the BL [Bill of Lading] to state

"Original" in order to accept it."). Mindful that the court's role in reviewing the evidence under Rule 29 is to ensure that a rational trier of fact could find the defendants guilty, the court finds that there was sufficient evidence that the defendants deprived CoBank of information necessary for it to make a discretionary economic decision and, as such, will not disturb the jury's verdict. See United States v. Hawkins, 547 F.3d 66, 70 (2d Cir. 2008) (in resolving a motion under Rule 29, the court should make all inferences in favor of the government and not upset the determination of the jury with regard to facts).

The defendants also argue that they had no intent to defraud because CoBank's loan to IIB was guaranteed by the CCC, and thus they intended for the bank to be made whole in the event of a loss. This argument was put to the jury with a "no ultimate harm" instruction. See Dinome, 86 F.3d at 280. The jury was instructed that:

> A genuine belief that the scheme never exposed the victim to loss or risk of loss could demonstrate lack of fraudulent intent. However, if you have found a defendant participated in the scheme for the purpose of causing some financial or property loss to Deutsche Bank or CoBank, any evidence of an honest belief on the part of the defendant that somehow, ultimately, there would be no loss, will not excuse fraudulent actions or false representations by him or her and is not good faith. . . . [G]ood faith on the part of [the defendants] is a complete defense to the charge of wire fraud.

Jury Charge at 64. The jury heard extensive testimony that the CCC had guaranteed the transactions at issue. See, e.g., Trial Tr. at 672:5-14 (Womack describing guarantee coverage on the Cool Express transaction). The jury heard the defendants' theory that these guarantees protected them from the charges of wire fraud. See Trial Tr. at 4807:4-11 (Lillemoe's closing argument that the guarantee protected CoBank from loss on the Cool Express transaction). The jury ultimately rejected this theory, and it is not for the court to disturb the jury's determination that a party's theory was not credible. See United States v. Strauss, 999 F.2d 692, 696 (2d Cir. 1993) (precluding

19

every reasonable hypothesis consistent with innocence is not necessary) (internal citations omitted).

        3.    There was Sufficient Evidence that the Misrepresentations were Material

Both Lillemoe and Calderon next argue that there was insufficient evidence for a rational jury to determine that the defendants' misrepresentations were material, i.e., that the misstatements had a "natural tendency to influence, or [were] capable of influencing, the decision-making body to which it was addressed." Neder v. United States, 527 U.S. 1, 16 (1999); See Lillemoe Mem. at 14-17; Calderon Mem. at 18-29. Lillemoe argues that there was insufficient evidence that CoBank cared about the difference between bills of lading marked "original" and those marked "non-negotiable." Lillemoe Mem. at 15.  He highlights that Womack admitted on cross examination that CoBank did accept non-negotiable bills of lading as complying presentations, id. (citing Trial Tr. at 650:11-22), and contends that the sole contrary evidence was the government's rebuttal expert, James Byrne, who stated that "a copy of a copy non-negotiable is not a copy of an original."  Lillemoe Mem. at 16 (citing Trial Tr. at 4586:10-11).  Lillemoe argues that no reasonable jury could have accepted Byrne's expert testimony over Womack's personal knowledge, and thus the jury's determination that the misrepresentations were material should be overturned.  Lillemoe Mem. at 16.

Calderon makes substantially the same argument, highlighting that in another GSM-102 transaction, both CoBank and the CCC were willing to accept a bill of lading marked "copy" and "non-negotiable."  Calderon Mem. at 23.  He also cites to Steven Lindo, the defendant's GSM-102 program expert, who stated that there was a general practice of accepting non-negotiable bills of lading.  Id. citing Trial Tr. at 3130:14-22.

The court rejects the defendants' argument that there was insufficient evidence of the materiality of the misrepresentations.  First, even were Lillemoe correct that the only testimony regarding the materiality of the misrepresentations were the conflicting testimonies of Womack and Byrne cited in his brief, it is not the court's place to choose between conflicting witness testimony.  United States v. Ferguson, 246 F.3d 129, 133-34 (2d Cir. 2001).  The question is not whether the court agrees with the jury's determination, but rather whether or not any rational trier of fact could find that the government established the defendant's guilt beyond a reasonable doubt.  United States v. Payton, 159 F.3d 49, 56 (2d Cir. 1998).  Professor Byrne offered significant testimony that non-negotiable bills of lading are different than original bills of lading.  Trial Tr. at 4585-86.  Womack also testified that CoBank would not have released funds if the bills of lading had been marked copy non-negotiable.  See, e.g., Trial Tr. at 500:25-501:8, 504:13-505:5, 509:3-15, 530:5-25, 542:4-543:1, 572:20-573:1.   Thus, although there is testimony that supports the defendants' theory, there is sufficient evidence of the materiality of the misrepresentations to support a finding of guilt beyond a reasonable doubt.  See United States v. Best, 219 F.3d 192, 200 (2d Cir. 2000).

Moreover, Lillemoe and Calderon ignore all of the other testimony supporting the inference that the banks involved in the transactions did care about whether the copies of the bills of lading were marked original.  First, Rudy Effing from Deutsche Bank testified that his bank likewise would not have accepted altered documents.  See Trial Tr. at 182:22-183:24, 215:20-216:10.  Second, Lillemoe himself expressed in emails that he believed that the banks would not accept copies of bills of lading not marked original.  See, e.g., Exs. 56, 60, 678.  This additional evidence serves to corroborate

Byrne's testimony that there is a material difference between a copy of an original bill of lading and a copy of a non-negotiable bill of lading.  Thus, the court will not disturb the jury's determination that the misrepresentation is material because there was sufficient evidence to support that determination, despite there being some evidence to the contrary.  See United States v. Bonventure, 646 F. App'x 73, 86 (2d Cir. 2016).

> B.    There was Sufficient Evidence to Support the Conspiracy Conviction of both Defendants

The defendants next argue that there was insufficient evidence to support their conspiracy convictions.  In order for the jury to have found Lillemoe and Calderon guilty of conspiracy, it needed to find beyond a reasonable doubt the follow elements:

1. That two or more persons entered into the unlawful agreement to commit wire fraud, bank fraud, or both, as charged in the Indictment, starting on about September 2007

2. That the defendant knowingly and willfully became a member of the conspiracy, with the specific intent to commit wire fraud, bank fraud, or both.

Jury Charge at 52; see also, 18 U.S.C. § 1349; 1 Leonard B. Sand et al., Modern Federal Jury Instructions: Criminal, Instruction 19-3.  Lillemoe argues that the government did not prove that he and Calderon entered into an unlawful agreement. Lillemoe Mem. at 23.  The thrust of the argument is that, because the jury acquitted their co-defendant Sarah Zirbes, who was equally involved in the Cool Express transaction, it is logically impossible to find that Lillemoe and Calderon entered into an

unlawful agreement that she did not also enter into, at least with regard to that transaction.[6]

Lillemoe misunderstands the law governing how the court should interpret the jury's verdict.  His argument presupposes that the court can and should tease out the logic between the jury's various findings of guilty and not guilty.  The law, however, is quite clear that "one defendant's conspiracy conviction does not become infirm by reason of jury verdicts of not guilty against all of his alleged coconspirators."  United States v. Acosta, 17 F.3d 538, 545 (2d Cir. 1994).  There are many reasons why a jury may or may not have rendered an inconsistent verdict and, as such, the court should not attempt to divine the precise contours of the jury's determinations beyond their verdicts of guilty and not guilty.  See id. at 546; see also, United States v. O'Connor, 650 F.3d 839, 856 (2d Cir. 2011) ("[I]nconsistent verdicts are not a ground for reversal.").

For example, the jury may have determined that Zirbes, as a new employee and someone not familiar with the GSM-102 program, lacked the requisite specific intent to defraud the banks, and therefore could not have had the specific intent to enter into the unlawful agreement.  It is also possible that the jury decided to acquit Zirbes for other reasons, including a belief that her conduct was less culpable than that of her co-defendants.  See United States v. Ferby, 108 Fed. App'x 676, 681 (2d Cir. 2004) (refusing to reverse a conviction because of possible jury lenity).  The court has no

---

[6] Lillemoe goes on to explain why there was insufficient evidence to find an unlawful agreement on other transactions.  See Lillemoe Mem. at 23- 26.  It is not necessary for the court to look to other transactions, because there was sufficient evidence of a conspiracy to commit wire fraud with regard to the Cool Express transaction.

basis to determine why the jury chose to acquit Zirbes and, consequently, the court declines to base a judgment of acquittal for her co-defendants on flimsy logical arguments based on her acquittal.  See United States v. Escalera, 536 Fed. App'x 27, 31 (2d Cir. 2013) (explaining that there are many reasons, including compromise, lenity, or accepting certain testimony only in part, which could explain a verdict, and therefore, the court should not try to parse the jury's rationale).

Calderon argues that the government failed to prove an unlawful agreement, based on his argument that the alterations were not unlawful, and thus an agreement to alter the documents was not an unlawful conspiracy.  See Calderon Mem. at 32. Because the court has determined that there was sufficient evidence for a rational jury to find that the alterations were unlawful, see supra section IV.A, this argument has no force.[7]

After reviewing the record, the court concludes that there was more than sufficient evidence to find that Lillemoe and Calderon entered into an unlawful agreement to commit at least wire fraud.  As noted above, there was ample evidence that Lillemoe and Calderon both committed wire fraud.  See supra section IV.A.  The government also introduced considerable evidence that Lillemoe and Calderon worked together in their scheme to defraud, such that the jury could have inferred that there was an agreement to commit wire fraud.  See Exs. 3 (email from Lillemoe to Zirbes with

---

[7] Calderon also argues that there was insufficient evidence to find intent to commit bank fraud. Calderon Mem. at 32.  The Indictment provides that the purpose of the conspiracy was to commit wire fraud and bank fraud.  Indictment at ¶ 27.  It was sufficient for the jury to find that the defendants entered into a conspiracy to commit wire fraud, and so the court does not need to reach Calderon's arguments regarding bank fraud because the court has concluded that there was sufficient evidence for a rational trier of fact to find that the defendants conspired to commit wire fraud.  See Jury Charge at 54.

Calderon carbon copied, instructing her to make the invoice and evidence of export for the same amount of money, and that if CoBank needed them to adjust either, they would just "do it by carrying out the tonnage a few more decimal points."), 6 (email from Calderon submitting the invoices and evidence of export cited in Exhibit 3). The government also introduced evidence of other transactions in which the defendants explicitly discussed their practice of doctoring documents, and expressed their concern that the documents would not pass an audit. See Exs. 9, 10, 11, 12. The government also introduced substantial evidence that Lillemoe and Calderon coordinated their businesses to facilitate their use of the GSM-102 program, including utilizing multiple companies and attempting to hide their business relationship. See, e.g., Exs. 51, 52. Taken together, and making all inferences in favor of the government, there was sufficient evidence for a rational jury to find beyond a reasonable doubt that the defendants entered into an unlawful agreement with the object of committing wire fraud. See United States v. James, 239 F.3d 120, 123-24 (2d Cir. 2000).

The defendants move in the alternative for a new trial under Rule 33. See Lillemoe Mem. at 4; Calderon Mem. at 1. It is worth noting that the same reasons which counsel against the court entering an order of acquittal militate against granting a new trial. The defendants offer no evidence that a manifest injustice has occurred, instead reiterating arguments which were presented to the jury and ultimately rejected. A new trial should be granted sparingly, and only where justice so requires. United States v. Triumph Capital Grp., Inc., 544 F.3d 149, 159 (2d Cir. 2008) (internal citation omitted). Thus, for the same reasons that the court denied the Motion for a Judgment of Acquittal,

and in the absence of any manifest injustice, the court denies the Motions for a New Trial.

     C.     <u>The Court's Decision to Exclude Evidence of the New GSM-102 Program Regulations was Proper</u>

Finally, Lillemoe requests that the court vacate the jury's verdict and grant him a new trial based on the court's decision to exclude evidence of the 2014 revisions of the GSM-102 program regulations. Lillemoe Mem. at 17. He argues that the exclusion of this evidence was not harmless error, and thus a new trial must be granted. <u>Id.</u> (citing <u>United States v. Detrich</u>, 865 F.2d 17, 21 (2d Cir. 1988). The court excluded this evidence under Rule 403 of the Federal Rules of Evidence, which permits the court to exclude relevant evidence "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting of time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. The trial court's determination that the probative value of evidence was substantially outweighed by the risk of confusion will only be disturbed if "arbitrary or irrational." <u>United States v. Al Jaber</u>, 436 Fed. App'x 9, 11 (2d Cir. 2011).

The exclusion of the subsequent revision of the GSM-102 program, as well as an excerpt from the Federal Register which explains that one of the justifications for the revision was to codify past industry practice, was discussed at length. <u>See</u> Trial Tr. at 3194:22-3203:18, 3279:4-3281:1. The court acknowledged that the revision was relevant evidence, under Rule 401, because it informed the defendants' theory that their behavior was standard in their industry, and thus did not constitute a material misrepresentation. Trial Tr. at 3199:18-3200:04. Ultimately, however, the court decided to exclude this evidence under Rule 403. <u>Id.</u> at 3279. The regulations had low

probative value because Lindo, the defendant's GSM-102 expert, testified as to the practice in the industry during the relevant period, and thus the new regulations, which were offered to suggest the industry practices during the period covered by the Indictment, were cumulative.  Id.  At the same time, the new regulations had a substantial risk of confusing the jury as to what standard governed the defendants' behavior during the relevant period.  Id. at 3280.

The court remains convinced that the probative value of this evidence was low and, as to the relevant time period, it was cumulative.  Lindo testified that the standard practice in the industry was for banks to routinely accept bills of lading marked non-negotiable during the relevant period.  Trial Tr. at 3130:5-22.  Thus, the jury had before it evidence of past practice with regard to non-negotiable bills of lading.  Additionally, the preamble to the regulations in the Federal Register does not make the defendants' argument about codifying past practices quite as the defendants argue it does.  They cite to a sentence in the background section of the preamble, which states that, "since [the original regulation's adoption], agricultural trade and finance practices have evolved.  This final rule is intended to reflect these changes to enhance the overall clarity and integrity of the program."  Lillemoe Mem. at 18 (citing Defense Ex. 2677 (Doc. No. 336-3) at 1).  However, what follows is twenty pages of specific comments and regulations dealing with all aspects of the GSM-102 program.  The court has no reason to believe that the removal of the requirement that the bill of lading be a copy of an original was to codify the referenced changes in trade practices, and was not one of the numerous changes that the CCC implemented "to improve efficiency of the program . . . and protect against waste and fraud," which were also cited as justification for the

revision.  Defense Ex. 2677 at 1.  Thus, the probative value of this evidence is low because it is not even clear that the exhibit stands for the proposition for which the defense offered it.

On the other side of the Rule 403 scales, the court found that there was a substantial risk that the entry of an additional set of complicated regulations—regulations that went into effect over two years after the conspiracy at issue ended—would confuse the jury as to the regulations they should be considering with regards to the defendants' conduct.  This evidence was excluded because its likelihood of confusing or misleading the jury far outweighed its probative value.  Thus, the court denies the portion of Lillemoe's Motion requesting a new trial on the basis of the non-admission of these regulations.

## V.    CONCLUSION

For the reasons set forth above, Lillemoe's Motion for a Judgment of Acquittal, or in the Alternative, a New Trial (Doc. No. 336) is **DENIED**.  Similarly, for the reasons set forth above, Calderon's Motion for Judgment of Acquittal or for a New Trial (Doc. No. 337) is **DENIED**.

**SO ORDERED.**

Dated at New Haven, Connecticut, this 16th day of March, 2017.

/s/ Janet C. Hall

Janet C. Hall
United States District Judge