UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CIVIL ACTION NO. |
| v. | : | 3:15-CR-25 (JCH) |
| | : | |
| PABLO CALDERON, | : | |
|     Defendant. | : | DECEMBER 1, 2017 |
| | : | |
| | : | |

**RULING RE: MOTION TO MODIFY THE PROTECTIVE ORDER (DOC. NO. 520) AND MOTIONS TO SEAL (DOC. NOS. 523 AND 546)**

**I. INTRODUCTION**

Pablo Calderon ("Calderon") moves to modify the Protective Order (Doc. No. 83) issued by this court on February 16, 2016. The Protective Order limited Calderon's use of certain discovery materials to his defense in his criminal proceeding in this court and prohibited the use of those documents in any other proceeding. (Doc. No. 83).

Calderon requests that the court amend the Protective Order to allow him to use select documents in a Freedom of Information Act ("FOIA") case in federal court in Washington, D.C., which was pending and known to all parties and the court at the time the Protective Order was entered. See Protective Order at 2–3. For the reasons that follow, Calderon's Motion to Modify the Protective Order is denied.

**II. FACTUAL BACKGROUND**

During the exchange of discovery leading up to Pablo Calderon's criminal trial before this court, the government produced documents pursuant to a Protective Order, which limited Calderon's use of the documents to his defense in his criminal case. See Calderon's Mem. in Supp. of his Mot. to Modify the Protective Order ("Mem. in Supp.") (Doc. No. 520-1) at 4. The documents the government produced under the Protective

Order included materials obtained from voluntary record searches conducted by personnel of the United States Department of Agriculture ("USDA") based on requests made by the defendants, as well as agent field notes and handwritten notes, correspondence, and other documents. See Gov't's Opp'n to Def. Calderon's Mot. to Modify the Protective Order ("Gov't's Opp'n") (Doc. No. 545) at 2. In the absence of the Protective Order, the government would have made a formal legal request to the USDA, which would have then reviewed thousands of pages line-by-line to make redactions on the basis of relevance, confidentiality, or other privileges. See id. at 3. The government transmitted Calderon's request for documents to the USDA—and ultimately produced an unredacted set of those documents under the Protective Order—even though the government objected to Calderon's insistence that it had a Brady obligation to search for USDA records. See Gov't's Opp'n to Defs.' Discovery Mots. (Doc. No. 93) at 8–9 (arguing that the government was under no obligation to search for USDA materials not currently in its possession because the prosecution did not run a joint investigation with the USDA). Thus, the Protective Order enabled the government to turn over discovery to Calderon and his co-defendants expeditiously and without litigation as to the government's duty to produce, the discoverability of the materials, or their scope, and without redactions. See Mem. in Supp. at 4.

Calderon seeks to modify the conditions of the Protective Order to allow him to use certain documents produced subject to its constraints in the FOIA litigation before Judge Tanya Chutkan in the District Court for the District of Columbia. The litigation before Judge Chutkan began in March 2014, when Calderon sued for access to documents he had requested from the Foreign Agricultural Service ("FAS")—a

component entity of the USDA—eight months earlier under FOIA. See id. at 6. The documents contain information about transactions in FAS's GSM-102 Export Guarantee Program ("GSM-102 Program"), which facilitates the financing of American agricultural exports by guaranteeing payments made by foreign financial institutions. See id. Calderon requested all records related to claims for banks in Ukraine, Kazakhstan, and Russia, as well as documents relating to annual compliance reviews between FY 2002 and FY 2012 for guarantees covering banks in the Eurasia Region and Russia issued to program exports other than Calderon and his co-defendant, Brett Lillemoe. See id.

The current dispute in the case before Judge Chutkan concerns Calderon's challenge to redactions the FAS made to documents it produced between October 2014 and January 2015, on the basis that certain information was confidential, see 5 U.S.C. § 552(b)(4), or personal, see 5 U.S.C. § 552(b)(6). See id. On February 21, 2017, the FOIA court issued a decision ruling in favor of Calderon with regard to records pertaining to countries that had not been in the program for several years and therefore did not present a risk of competitive harm to program participants. See id. at 8. In addition, Judge Chutkan denied both parties' arguments for summary judgment regarding information that Calderon argued was in the public domain. See id. Finally, the FOIA court rejected Calderon's argument that there could be no competitive harm to program participants due to the structured nature of the transactions. See id. Because Calderon based his argument only on his own declaration, the court found that he did not possess personal knowledge of the form of the transactions engaged in by businesses that objected to the release of records. See id. Calderon moves for a

modification of the Protective Order to allow him to use documents obtained in discovery in his criminal case to support his arguments in the FOIA case. See id. at 5.

## III. DISCUSSION

### A. Legal Standard

Federal Rule of Criminal Procedure 16(d)(1), "Protective and Modifying Orders," provides that "[a]t any time the court may, for good cause, deny, restrict, or defer discovery or inspection, or grant other appropriate relief." Fed. R. Crim. P. 16(d)(1). In determining whether "good cause" exists to implement a protective order, courts look to whether the party seeking a protective order has shown that "disclosure will result in a clearly defined, specific and serious injury." United States v. Smith, 985 F. Supp. 2d 506, 523 (S.D.N.Y. 2013) (quoting In re Terrorist Attacks on September 11, 2011, 454 F. Supp. 2d 220, 222 (S.D.N.Y. 2006)). "In cases of unusual scope and complexity . . . broad protection during the pretrial stages of litigation may be warranted without a highly particularized finding of good cause." Id.

The Second Circuit has not interpreted the meaning of "good cause" in the context of modifying a protective order entered in a criminal case. See United States v. Kerik, 07 CR 1027 (LAP), 2014 WL 12710346 at *1, n.1 (S.D.N.Y. July 23, 2014) (noting that the Second Circuit has only addressed the standard for modifying protective orders entered in civil cases). Requests to modify protective orders entered in civil cases occur far more frequently. Thus, courts in other circuits, and at least one court in this circuit, have looked to standards developed in the context of civil protective orders for guidance on what constitutes "good cause" to modify a protective order entered in a criminal case. See, e.g., United States v. Morales, 807 F.3d 717, 723 (5th Cir. 2015)

4

(borrowing from the standard for "good cause" under Fed. R. Civ. P 26(c) in the civil context to determine whether to modify a protective order entered in a criminal case); United States v. Wecht, 484 F.3d 194, 211 (3rd Cir. 2007) (same); Kerik, 2014 WL 12710346 at *1 (applying the Second Circuit's standard for the modification of protective orders entered in a civil lawsuit).

The Second Circuit has held that, "[w]here there has been reasonable reliance by a party or deponent, a District Court should not modify a protective order under Rule 26(c) 'absent a showing of improvidence in the grant of [the] order or some extraordinary circumstance or compelling need.'" S.E.C. v. TheStreet.com, 273 F.3d 222, 229 (2d Cir. 2001) (quoting Martindell v. Int'l Tel. & Tel. Corp., 594 F.2d 291, 296 (2d Cir. 1979). Whether the Martindell presumption against modifying protective orders applies "depends on the nature of the protective order and whether it invited reasonable reliance by a party or deponent." In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig., 255 F.R.D. 308, 318 (D. Conn. 2009). To determine whether a party has reasonably relied on the protective order, courts look to: "(1) the scope of the protective order; (2) the language of the order itself; (3) the level of inquiry the court undertook before granting the order; and (4) the nature of reliance on the order." Id. Courts may also consider the "type of discovery materials the [party] seeks and the party's purpose in seeking a modification." Id.

B. Modification of the Protective Order

Calderon argues that the USDA-FAS's misrepresentations in the FOIA case are a change of circumstance and invalidate any claim of reliance by the government on the terms of the Protective Order. See Reply Mem. in Supp. of Pablo Calderon's Mot. to

5

Modify the Protective Order ("Reply Mem.") (Doc. No. 549) at 5. He argues that no parties will be prejudiced because he only asks the court to modify the Protective Order to allow Judge Chutkan to view and consider the documents under seal under a Protective Order that she will issue. Id. at 6. The government argues that the Protective Order was entered for good cause, the USDA relied on the Protective Order, and Calderon has not offered a compelling reason to amend the Protective Order. See Gov't's Opp'n at 1.

The parties disagree about the correct standard to apply to modifications of protective orders. The government follows the analysis of Second Circuit decisions on the modification of protective orders in civil cases, see Gov't's Opp'n at 6, while Calderon argues that the Second Circuit standard in civil cases is inapt and instead draws upon cases in other circuits that analyze criminal protective orders specifically, see Reply Mem. at 5. To the extent Calderon argues for a "good cause" standard, he relies on cases outside of the Second Circuit. Curiously, each case Calderon cites recognizes that the phrase "good cause" is not defined in Rule 16 and has not been defined in the case law in the context of modifying protective orders. Those circuits, like the Second Circuit, all use factors from their own civil cases to guide the analysis in a criminal case such as this one. See Morales, 807 F.3d at 723 ("We have not identified what constitutes 'good cause' to modify a Rule 16(d)(1) protective order, but we find it prudent to borrow from the civil context."); United States v. O'Brien, 2014 U.S. Dist. LEXIS 6279 at *10 (D. Mass. Jan 17, 2014) ("[I]t is appropriate to analyze the 'good cause' requirement under the criminal rules in light of precedent analyzing protective orders entered in civil cases") (quoting United States v. Swartz, 945 F. Supp. 2d 216,

219 (D. Mass. 2013)); United States v. Bulger, 283 F.R.D. 46, 53–58 (D. Mass. 2012) (analyzing a motion to modify a protective order entered in a criminal case using standards from civil cases). By looking to criminal cases in the First and Fifth Circuits, the court in effect would be importing the standards from civil cases in those circuits, which differ from the standard for modifying protective orders entered in civil cases in the Second Circuit. See In re Ethylene, 255 F.R.D. at 317–18 (comparing standards among circuits).

There is a strong presumption against the modification of protective orders in the Second Circuit. See TheStreet.com, 273 F.3d at 229. However, the presumption against modification of protective orders does not apply where a litigant "could not reasonably have relied on the continuation of a protective order." See id. at 231. Application of the presumption "depends on the nature of the protective order and whether it invited reasonable reliable by a party or deponent." See In re Ethylene, 255 F.R.D. at 318.

To determine whether a protective order reasonably invited reliance, courts first consider its scope. See In re Ethylene, 255 F.R.D. at 319. Blanket protective orders tend to be overinclusive and may cover documents that a party would have been required to disclose without a protective order. Id. (quoting Public Citizen v. Liggett Group, Inc., 858 F.2d 775, 790 (1st Cir. 1988). However, the breadth of the Protective Order entered in this case does not undercut the government's reliance argument because the documents Calderon seeks are precisely the documents the Protective Order was intended to cover. See Morales, 807 F.3d at 723. The parties agreed upon the Protective Order so that the U.S. Attorney's Office could speedily obtain documents

from the USDA for Calderon's review and possible use in his criminal defense. Ordinarily, the USDA would have combed through the records for privileged material before their release. While many of those documents have proved not to be subject to an exemption under FOIA—and have accordingly been provided to Calderon through the FOIA litigation in D.C.—the USDA produced unredacted documents that were responsive to Calderon's discovery request on the understanding that all of them would undergo the ordinary vetting process before they could be used in any other proceeding besides Calderon's criminal case. Therefore, the scope of the Protective Order indicates that it induced reliance.

Next, courts look to the express language of the order. In re Ethylene, 255 F.R.D. at 320. When a protective order limits its application to a stage of a proceeding or contemplates a revision in the future, it may not have been reasonable for a party to rely on the permanence of the protective order. Id. Here, there is no language suggesting the duration of the Protective Order was limited. To the contrary, the Protective Order provided:

> At the request of the Government, after disposition by final, non-appealable judgment or other resolution of the charges against the Defendants, including after verdict, sentence, or subsequent collateral attack, all Discovery Materials disclosed pursuant to this Order and all copies thereof shall either be promptly destroyed or returned to the United States.

Protective Order at 4. This factor therefore weighs in favor of finding that the Protective Order invited reasonable reliance.

Third, courts look at the level of inquiry the court gave prior to granting the order. See In re Ethylene, 255 F.R.D. at 321. A protective order that specifies the kind of documents it is intended to protect, or was granted after a hearing to show good cause,

8

is entitled to more weight than one that does not evidence meaningful court review. See id. at 321–22; Fournier v. Erickson, 242 F. Supp. 318, 341 (S.D.N.Y. 2003). The parties in this case stipulated to the Order and the court did not find good cause as to each document. However, the court made the conscious decision to implement the Protective Order to allow for broad and quick discovery in Calderon's criminal case, while not serving as a backdoor for Calderon to bring those documents into other litigation. See Gov't's Mot. on Consent for Proposed Order Providing for Disclosure and Protection of Disc. Materials and to Amend Mot. Schedule for Disc. Mots. ("Gov't's Mot. on Consent") (Doc. No. 81) at 2.

The court was aware of Calderon's FOIA litigation at the time it entered the Protective Order. It was concerned that Calderon was seeking the documents not because they were necessary to his defenses,[1] but rather to "end run" the government in the FOIA litigation. The undersigned viewed the Protective Order as the appropriate means to assure to Calderon all that conceivably might be needed to defend himself against the criminal charges, without allowing him to end run the FOIA litigation. Calderon agreed to language in the Protective Order that he knew would preclude the use of material produced under its terms in his FOIA case, which had begun two years before the Order entered in this case. See Protective Order at 2–3 ("[T]he Discovery Materials shall not and may not be used in any other federal or state civil or criminal proceedings, nor in any regulatory proceeding, nor in any appeal of a finding of an Administrative Law Judge, nor any proceeding before any department or regulatory agency, nor shall they be used in a request pursuant to the Freedom of Information Act

---

[1] None of the documents were used as exhibits at trial. See Gov't's Opp'n at 12.

9

'FOIA'"). The court's consideration of the potential use of the discovery materials in litigation that was already ongoing at the time of the Protective Order favors the application of the presumption against modification.

Fourth, courts look at the nature of the reliance on the Protective Order. See In re Ethylene, 255 F.R.D. at 322. There is a stronger presumption of reliance where a party agrees to "provide materials based . . . solely on the maintenance and enforceability of the protective order." Id. at 323. Where a party "would have been compelled to produce the discovery materials even in the absence of a protective order, the presumption against modification is not as strong." Id. This factor is important because courts are wary of allowing a blanket protective order to shift the burden of showing, or disproving, "good cause" to restrict access to information from the party producing discovery to the party receiving discovery. Id.

Without the Protective Order, the USDA would not have produced unredacted documents containing potentially confidential information without any review. See Gov'ts Opp'n Ex. B (specifying in the cover letter to the document production that—subject to the Protective Order—records that had been redacted were now being provided without redactions). Calderon has not been wrongly charged with the burden of proof to obtain access to information to which he would otherwise be entitled. Rather, he is in exactly the same position of challenging the USDA's claims of privilege as he would if the Protective Order had not induced the USDA to forego its review process for the purpose of providing him discovery for his criminal case.

Finally, courts consider the type of materials sought by the party that has moved to modify the protective order. See In re Ethylene, 255 F.R.D. at 324. If a party could

access the same documents itself in other litigation, it saves judicial resources to avoid duplicative discovery. However, if the litigant is attempting to get around obstacles in discovery in a separate case and access documents the party would not otherwise have a right to, the court should not modify the protective order. Id.

Calderon is currently litigating the very process that the Protective Order enabled him to avoid in his criminal case. Due to the assurances in the Protective Order, the USDA bypassed its usual process of reviewing the documents and redacting or not releasing information that is personal, private, or proprietary. See Gov.'s Opp'n at 14. The burden remains on the USDA-FAS to show that information it wishes to withhold is privileged or otherwise exempt from production under FOIA. The appropriate avenue for Calderon's challenge to those arguments is his suit under FOIA, not the modification of the Protective Order entered in his now-closed criminal case. The purpose of the Protective Order was to limit Calderon's use of discovery materials to his criminal case. Calderon cannot now use those documents in the process the Protective Order initially circumvented.

The Martindell presumption therefore applies, limiting the modification of a protective order "absent a showing of improvidence in the grant of the order or some extraordinary circumstance or compelling need." TheStreet.com, 273 F.3d at 229 (quoting Martindell, 594 F.2d at 296). That high bar is not met in this case. First, the Protective Order was not improvidently granted. Rather, it allowed the government to speedily produce over 150,000 pages of unredacted documents to Calderon and Lillemoe so that they could prepare for their criminal defense without compromising the USDA's responsibility to protect confidential and personal information. See Gov't's

Opp'n at 12–13; Reply Mem. of Law in Supp. of Mot. for an Order Directing the Gov't to Search for and Produce Brady Material (Doc. No. 97) at 3–4 (identifying the government's production of USDA documents exceeding 150,000 pages).

Second, Calderon has also not shown a compelling reason to modify the Protective Order. Calderon argues that the FAS misrepresented facts to the FOIA court and that he needs to modify the Protective Order so that he can use documents before Judge Chutkan in order to impeach the FAS and support his arguments. See Mem. in Supp. at 9–10. The government argues that Calderon is effectively asking to litigate his FOIA case in this court. See Gov't's Opp'n at 18. The government argues that the FOIA court, not this court, is best positioned to assess whether the USDA-FAS acted in "bad faith" in the FOIA litigation in Washington, D.C. See id. at 19.

The court agrees that Calderon has not shown a compelling reason to modify the Protective Order. The court entered the Protective Order to allow for broad discovery in Calderon's criminal case without becoming a backdoor for Calderon to use discovery from his criminal case in the FOIA litigation in Washington, D.C. Nothing has changed since the time the court entered the Protective Order. The FOIA court—not the court where Calderon had his criminal trial—is the proper forum for Calderon to challenge any alleged impropriety in response to his FOIA request.

As previously discussed, Calderon defines "good cause" under Rule 16(d) using criminal cases from other circuits, which in turn rely on civil cases from their respective circuits. See supra 6–7. Calderon's interpretation of "good cause" would therefore have the effect of substituting the factors from civil cases in other circuits for the Second Circuit standard. Even assuming the court were to analyze the "good cause" standard

12

from Rule 16(d)(1) in some abstract, equitable sense without considering any of the Second Circuit case law, Calderon still falls well short of meeting such a standard. The court finds it abundantly clear that there is no unfairness to Calderon in leaving the Protective Order undisturbed. Calderon argues that it is unjust that he cannot use the documents provided in his criminal case in his FOIA litigation to expose the alleged misrepresentations made by the FAS. See Reply Mem. at 11–12. The court concludes that it is not unjust to require Calderon to support his argument without the benefit of unredacted documents produced under a Protective Order premised on the understanding that Calderon would follow standard administrative procedures before using USDA records in other litigation. Calderon is in no different position than if the government had provided him with discovery in his criminal case absent the Protective Order. Calderon would have then received documents with redactions for privileged material presumably identical to those he has as a result of his FOIA request.

This court determined that it was fair for Calderon to receive discovery material under the Protective Order at his criminal trial to allow him to defend himself vigorously. It is not now unfair for Calderon to be in the same situation as if the unredacted discovery he received for his criminal case, which was produced without legal process on the condition that there was a protective order in place, had not been made available. Calderon may well not be able to "unsee" the discovery he received in his criminal case under the Protective Order, but he is prohibited from using what is in his head in any proceeding other than defending his criminal case according to the unambiguous words of the Protective Order Calderon agreed to. If Calderon's attorneys

cannot get the discovery "out of their heads," then they should not represent him outside of his criminal case.[2]

## IV. CONCLUSION

For the foregoing reasons, Calderon's Motion to Modify the Protective Order is denied.

In addition, the Motion to Seal Certain Portions of Pablo Calderon's Motion to Modify the Protective Order (Doc. No. 523) and the Sealed Motion for Leave to File Under Seal Government's Attachments B and C to its Opposition to Defendant Calderon's Motion (Doc. No. 546) are granted.

If it is the government's view that Calderon has violated this court's Protective Order, this court would expect the government file a motion for contempt.

**SO ORDERED.**

Dated at New Haven, Connecticut this 1st day of December, 2017.

/s/ Janet C. Hall
Janet C. Hall
United States District Judge

---

[2] It appears that Calderon's counsel in D.C. was involved in his criminal case but did not file an appearance. See Reply Mem. at 5 n.1;